UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Archdiocese of Saint Paul and Minneapolis,

Court File No. 14-cv-04852-RHK-BRT

Plaintiff,

v.

The Continental Insurance Company, as
successor to The Fidelity and Casualty
Company of New York, Fireman's Fund
Insurance Company, as successor to
Fireman's Fund Indemnity Company,
National Fire Insurance Company of
Hartford, TIG Insurance Company, as
successor to International Insurance
Company, Continental Casualty Company,
Hartford Accident and Indemnity
Company, American Home Assurance
Company, The Aetna Casualty and Surety
Company, n/k/a Travelers Casualty and
Surety Company, Certain Underwriters at
Lloyd's, London subscribing to Policies
SL3721, SL3722, SL3723, ISL3115, ISL3116,
ISL3117, ISL3675, ISL3613, ISL3614, and
ISL3615, Bellefonte Insurance Company,
Excess Insurance Company a/k/a Excess
Insurance Company Limited, Terra Nova
Insurance Company Limited, Dominion
Insurance Company, Sovereign Marine &
General Insurance Company Limited a/k/a
Sovereign Marine & General Insurance
Company Limited, Stronghold Insurance
Company Limited, Yasuda Fire & Marine
Insurance Company (U.K.) Limited, Sphere
Drake Insurance PLC, CNA Reinsurance of
London, Limited, Interstate Fire and
Casualty Company, 21st Century
Centennial Insurance Company f/k/a

Colonial Penn Insurance Company,

        Defendants.

The Continental Insurance Company, as
successor to The Fidelity and Casualty
Company of New York, Continental
Casualty Company, in its own capacity and
as successor by merger to National Fire
Insurance Company of Hartford,

        Third-Party Plaintiffs,

   v.

Catholic Mutual Relief Society and State
Farm Fire & Casualty Company,

        Third-Party Defendants.

**THE CONTINENTAL INSURANCE COMPANY, CONTINENTAL CASUALTY COMPANY, AND NATIONAL FIRE INSURANCE COMPANY OF HARTFORD'S ANSWER, AFFIRMATIVE DEFENSES, CROSS-CLAIMS, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT FOR DECLARATORY RELIEF**

Defendants The Continental Insurance Company ("CIC"), as successor by

merger to The Fidelity and Casualty Company of New York ("F&C"), Continental

Casualty Company ("Continental Casualty"), and National Fire Insurance Company of

Hartford ("NFIC"), (collectively, "CNA Insurers") hereby answer the Complaint for

Declaratory Relief of Plaintiff Archdiocese of Saint Paul and Minneapolis

("Archdiocese") as follows.  Anything not specifically admitted in this Answer is

hereby denied.

## BACKGROUND

1.      The Archdiocese encompasses 12 Twin Cities metro-area counties in Minnesota, including Ramsey, Hennepin, Anoka, Carver, Chisago, Dakota, Goodhue, Le Sueur, Rice, Scott, Washington, and Wright counties (the "Region").  Approximately 825,000 parishioners and 187 parishes are within the Archdiocese's bounds.  The Archdiocese is the embodiment of the Roman Catholic Church ("Church") in the region, and its purpose is to promote spiritual, educational, and other interests of the Church, including charitable, benevolent, eleemosynary, and missionary work.

**ANSWER:**    CNA Insurers admit the first sentence.  CNA Insurers lack

sufficient knowledge or information to admit or deny the remaining allegations in

Paragraph 1 of the Complaint.

2.      Effective May 25, 2013, the Minnesota Legislature enacted the Minnesota Child Victims Act, Minn. Stat. § 541.073, which allows individuals with certain previously time-barred claims alleging abuse, as defined in Minn. Stat. §§ 609.342 to 609.3451, to now file claims which will be considered timely as long as those claims are filed by May 25, 2016.

**ANSWER:**    CNA Insurers admit that effective May 25, 2013, the Minnesota

Legislature enacted the Minnesota Child Victims Act, Minn. Stat. § 541.073.  The

remaining allegations in Paragraph 2 provide an incomplete and therefore inaccurate

summary of the Child Victims Act, and on that basis, CNA Insurers deny them.

3.      Since enactment of the Child Victims Act, the Archdiocese has been named as a defendant in over 20 lawsuits, and has received numerous additional Notices of Claim, alleging that the Archdiocese was negligent in not preventing such abuse by clergy while associated with the Archdiocese (collectively the "Clergy Abuse Claims").  Moreover, the Archdiocese continues to receive new claims on a regular basis.  Individuals asserting Clergy Abuse Claims are referred to herein as "Clergy Abuse Claimants."

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 3, except to admit that it has received notice of

numerous Clergy Abuse Claims.[1]

4.    The Archdiocese has been working with plaintiffs' counsel to address and
resolve the issues relating to the Clergy Abuse Claims.  It has implemented new child
protection protocols and created new positions designed to implement and ensure
compliance with the child protection protocols.  It is also committed to achieving a
global resolution of the financial aspects of the Clergy Abuse Claims.  A key source of
funds for any such resolution, among others, is the Archdiocese's insurance coverage.

**ANSWER:**    CNA Insurers admit the second sentence.  CNA Insurers lack

sufficient knowledge or information to admit or deny the remaining allegations in

Paragraph 4.

5.    The Archdiocese purchased substantial amounts of insurance to cover the
type of injuries for which the Clergy Abuse Claimants seek recovery.  The Archdiocese
has tendered each Clergy Abuse Claim to each Carrier providing coverage for a policy
period implicated by such Clergy Abuse Claim.  Each of the Carriers have reserved
their rights and, in some cases denied coverage, on various grounds.  As part of its
effort to achieve a global financial resolution of the Clergy Abuse Claims, the
Archdiocese has been seeking contributions from the Carriers.  To date, the Carriers
have not agreed to contribute towards a global resolution. To further a global
resolution, the Archdiocese seeks declarations regarding the specific rights of the
Archdiocese and the obligations of each Carrier as to their obligations with respect to
Clergy Abuse Claims.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 5 except to admit that the Archdiocese has tendered

certain claims to CNA Insurers, CNA Insurers have reserved their rights, and in some

---

[1] Except as otherwise indicated, capitalized terms used here are as defined in the
Archdiocese's Complaint.

cases denied coverage, for claims tendered, and that CNA Insurers have not agreed to

contribute to a global resolution of the Clergy Abuse Claims. CNA Insurers further

admit that the Archdiocese seeks declarations regarding the rights of the Archdiocese

and the obligations of the Carriers.

## THE PARTIES

6.      The Archdiocese's principal place of business is in Saint Paul, Minnesota
and is organized as a Minnesota church corporation under Minn. Stat. § 315.16. The
secular embodiment of the Archdiocese is sometimes referred to as the Chancery
Corporation. The Archdiocese is formerly known as the Diocese of Saint Paul and the
Diocese of Saint Paul and Minneapolis. This complaint is filed only on behalf of the
Archdiocese and not any parishes.

**ANSWER:**    CNA Insurers admit the last sentence. CNA Insurers lack sufficient

knowledge or information to admit or deny the remaining allegations in Paragraph 6.

7.      The Continental Insurance Company, successor to The Fidelity and
Casualty Company of New York, is a subsidiary of CNA Financial Corporation
("CNA"). For simplicity's sake, this entity is referred to as "F&C." F&C is a
Pennsylvania corporation with its principal place of business in Chicago, Illinois.

**ANSWER:**    CNA Insurers admit the allegations contained in Paragraph 7.

8.      Fireman's Fund Insurance Company, successor to Fireman's Fund
Indemnity Company ("FFIC") is a California company with its principal place of
business in Novato, California.

**ANSWER:**    On information and belief, CNA Insurers admit the allegations in

Paragraph 8.

9.      National Fire Insurance Company of Hartford ("NFIC") is an Illinois
company with its principal place of business in Chicago, Illinois. NFIC is a subsidiary
of CNA.

**ANSWER:** On information and belief, CNA Insurers admit the allegations

contained in Paragraph 9.

10. TIG Insurance Company, successor to International Insurance Company
("International"), is a California company with its principal place of business in
Manchester, New Hampshire.

**ANSWER:** On information and belief, CNA Insurers admit the allegations in

Paragraph 10.

11. Continental Casualty Company ("Continental") is an Illinois company
with its principal place of business in Chicago, Illinois.  Continental is a subsidiary of
CNA.

**ANSWER:** CNA Insurers admit the allegations contained in Paragraph 11.

12. Hartford Accident and Indemnity Company ("Hartford") is a Connecticut
company with its principal place of business in Hartford, Connecticut.

**ANSWER:** On information and belief, CNA Insurers admit the allegations in

Paragraph 12.

13. American Home Assurance Company ("American Home") is a New York
company with its principal place of business in New York, New York.

**ANSWER:** On information and belief, CNA Insurers admit the allegations in

Paragraph 13.

14. The Aetna Casualty and Surety Company, n/k/a Travelers Casualty and
Surety Company is a Connecticut company with its principal place of business in
Hartford, Connecticut.  To correspond with the policies, this entity is referred to as
"Aetna."

**ANSWER:** The CNA Insurers lack sufficient information to admit or deny the

allegation that the policies refer to the Aetna Casualty and Surety Company as "Aetna."

On information and belief, CNA Insurers admit the remaining allegations in Paragraph

14.

15.　　The Archdiocese was issued insurance policies, numbered SL3721, SL3722, SL3723, ISL3115, ISL3116, ISL3117, ISL3675, ISL3613, ISL3614, and ISL3615, underwritten by certain underwriters at Lloyd's, London (collectively, the "Lloyd's Policies"). The underwriters of the Lloyd's Policies are syndicates (the "Syndicates") consisting of privately owned companies or people, known as "Names," and the Syndicates act through "Managing Agents." Upon information and belief, the Syndicates, Names, and Managing Agents of each of the Lloyd's Policies identified in the caption are all citizens of, and have a principal place of business in, the United Kingdom or other jurisdictions outside the United States. Upon information and belief, none of the Syndicates, Names, or Managing Agents are citizens of Minnesota.

**ANSWER:**　CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in the first sentence of Paragraph 15. On information and belief,

CNA Insurers admit the remaining allegations in Paragraph 15.

16.　　Upon information and belief, Bellefonte Insurance Company ("Bellefonte"), Excess Insurance Company a/k/a Excess Insurance Company Limited ("Excess"), Terra Nova Insurance Company ("Terra Nova"), Dominion Insurance Company ("Dominion"), Soverign Marine & General Insurance Company Limited a/k/a Sovereign Marine & General Insurance Company Limited ("Sovereign"), Stronghold Insurance Company Limited ("Stronghold"), Yasuda Fire & Marine Insurance Company (U.K.) Limited ("Yasuda"), Sphere Drake Insurance PLC ("Sphere Drake"), and CNA Reinsurance of London, limited ("CNA London") are all insurers who are citizens of, and have a principal place of business in, the United Kingdom or other jurisdictions outside the United States. Bellefonte, Excess, Terra Nova, Dominion, Sovereign, Stronghold, Yasuda, Sphere Drake, and CNA London are not citizens of Minnesota. The Syndicates, Names, and Managing Agents of the Lloyd's Policies, and Bellefonte, Excess, Terra Nova, Dominion, Sovereign, Stronghold, Yasuda, Sphere Drake, and CNA London, are all collectively referred to herein as the "London Market Insurers."

**ANSWER:**　On information and belief, CNA Insurers admit the allegations in

Paragraph 16.

17.     Interstate Fire and Casualty Company ("Interstate") is an Illinois company with its principal place of business in Chicago, Illinois.

**ANSWER:**     On information and belief, CNA Insurers admit the allegations in

Paragraph 17.

18.     21st Century Centennial Insurance Company f/k/a Colonial Penn Insurance Company ("Colonial Penn") is a Pennsylvania company with its principal place of business in Wilmington, Delaware.

**ANSWER:**     On information and belief, CNA Insurers admit the allegations in

Paragraph 18.

## JURISDICTION AND VENUE

19.     This is an action for declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

**ANSWER:**     CNA Insurers admit the allegations in Paragraph 19.

20.     The Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because the parties are citizens of different states or foreign jurisdictions and the amount in controversy is in excess of $75,000 exclusive of interest and costs.

**ANSWER:**     On information and belief, CNA Insurers admit the allegations in

Paragraph 20.

21.     In addition, the Court has supplemental jurisdiction under 28 U.S.C. § 1367 because the claims against each Carrier are so related to the claims in this action that they form part of the same case or controversy.

**ANSWER:**     CNA Insurers admit the allegations in Paragraph 21.

22.     This Court has personal jurisdiction over each Carrier because each Carrier has sufficient contacts with the state of Minnesota.  Further, each has otherwise availed itself of the markets of Minnesota including the issuance to the Archdiocese of the policies at issue in this matter.

**ANSWER:** CNA Insurers admit that they are subject to personal jurisdiction in Minnesota. On information and belief, CNA Insurers admit the allegations in Paragraph 22 as they pertain to other Carriers.

23. In addition, Aetna, American Home, F&C, Continental, Hartford, International, NFIC, and Colonial Penn are authorized to do business in Minnesota including being licensed as property and casualty insurers.

**ANSWER:** CNA Insurers admit that CIC, NFIC, and Continental Casualty are authorized to do business in Minnesota and are licensed as property and casualty insurers. On information and belief, CNA Insurers admit allegations in Paragraph 23 as they pertain to other defendants.

24. Further, this Court has personal jurisdiction over the London Market Insurers because they agree in their policies to submit to jurisdiction in Minnesota.

**ANSWER:** On information and belief, CNA Insurers admit the London Market Insurers are subject to the personal jurisdiction of the Court. CNA Insurers lack sufficient information to admit or deny the remaining allegations in Paragraph 24.

25. Venue is proper in this District under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the dispute occurred in this District including the issuance of the respective Policies at issue to the Archdiocese, the Archdiocese's payment of premiums under the Policies for its share of the coverage, the Archdiocese's assertion of its rights to coverage under the Policies, and each carrier's refusal to accede to the Archdiocese's assertion of its rights in certain respects.

**ANSWER:** CNA Insurers admit that venue is proper in this District under 28 U.S.C. § 1391(a)(2). CNA Insurers otherwise deny the allegations in Paragraph 25.

# FACTS

## F&C

26.    F&C issued various primary policies of insurance to the Archdiocese, including Policy No. XP74084, for the policy period ending August 1, 1952, and Policy No. XP128258 for the period August 1, 1952 – August 1, 1955 (the "F&C Policies"). Policy No. XP128258 provides bodily injury limits of $100,000 per person, with no aggregate limits.  Upon information and belief, Policy No. XP74084, which preceded Policy No. XP128258, was also a three-year policy providing bodily injury limits of $100,000 per person per year, with no aggregate. Both F&C Policies are "duty to defend" policies.

**ANSWER:**    Despite diligent searching, CIC has been unable to locate any copy

or secondary evidence of the alleged F&C Policies.  The Archdiocese reports that it has

not located a copy of the alleged F&C Policies.  The Archdiocese has provided a

declarations page, which purports to be a declarations page for the alleged Policy No.

XP128258, but the terms and conditions of the policy are missing.  The Archdiocese also

relies on this document as secondary evidence for the alleged Policy No. XP74084.

Based on this incomplete record, CNA Insurers lack sufficient information to admit or

deny the allegations in Paragraph 26.

## FFIC

27.    FFIC issued various primary policies of insurance to the Archdiocese, including Policy No. GAC312672 for the period August 1, 1955 – August 1, 1958 and Policy No. CL331931 for the period August 1, 1958 – August 1, 1961 (together the "FFIC Policies").  In the FFIC Policies, FFIC agrees "[t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person."  FFIC also agrees to "defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent … ."  The FFIC Policies provide limits of

$100,000 per person per year, with no aggregate limits.  The FFIC Policies apply "to accidents which occur during the policy period within the United States of America."

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 27.

**NFIC**

28.    NFIC issued primary insurance coverage to the Archdiocese for the period August 16, 1963 – August 16, 1966, including Policy No. HO4527587 (the "NFIC Policy").  NFIC agreed "[t]o pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury … and the Company shall defend any suit against the Insured alleging such bodily injury … and seeking damages which are payable under the terms of this policy, even if any of the allegations of the suit are groundless, false or fraudulent … ."  "Bodily injury" is defined as "bodily injury, sickness or disease, including death resulting therefrom, sustained by any person."  The NFIC Policy provides limits of $500,000 per occurrence with no aggregate limit.

**ANSWER:**    Paragraph 28 provides an incomplete and therefore inaccurate

summary of Policy No. HO4527587, and on that basis CNA Insurers deny the

allegations in Paragraph 28.

**International**

29.    International issued primary insurance coverage to the Archdiocese, including Policy No. GA114938, for the period August 1, 1967 – August 1, 1970 (the "International Policy").  International agreed to "pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay because of … bodily injury … to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury… ."

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 29.

30.    The International Policy provides limits of $100,000 per person per year, with no aggregate limits applicable with respect to the Clergy Abuse Claims.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or deny the allegations in Paragraph 30.

## Continental

31.    Continental issued various policies of insurance to the Archdiocese, including Policy No. RDU9799786 for the period August 17, 1966 – August 17, 1969 (the "Continental Policy"), which sits above the underlying policies in place from August 1966 to August 1969.  The Continental Policy provides $3 million in umbrella coverage for each occurrence, with no applicable aggregate limit.

**ANSWER:**    Despite diligent searching, Continental Casualty has been unable to

locate any copy or secondary evidence of the alleged Policy No. RDU9799786.  The

Archdiocese reports that it has not located a copy of Policy No. RDU9799786.  The

Archdiocese has provided a declarations page, which purports to be a declarations page

for the alleged Policy No. RDU9799786, but the terms and conditions of the policy are

missing.  Based on this incomplete record, CNA Insurers lack sufficient information to

admit or deny the allegations in Paragraph 31.

32.    The declaration page for the Continental Policy is form number P1-40102-A.  Upon information and belief, the Continental Policy includes Insuring Agreement form number P1-40103-A.

**ANSWER:**    CNA Insurers deny the allegations in Paragraph 32.

33.    Under policy form 40103-A, Continental agreed "[t]o indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of liability, (a) imposed upon the Insured by law, … for damages, direct or consequential, and expenses, all as defined by the term "ultimate net loss" on account of, Personal Injuries … caused by or arising out of each occurrence." "Personal Injuries" are defined as "Bodily Injury, Mental Injury, Mental Anguish, Shock, Sickness, … Humiliation,

Invasion of right of privacy… ." "Ultimate Net Loss" is "the total sum which the Insured or any company as his insurer becomes obligated to pay by reason of Personal Injury … either through adjudication or compromise, and all sums paid for expense including … in respect to litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder … ."

**ANSWER:**   Policy form 40103-A is a form and as such, it is not an agreement by which Continental Casualty is bound unless it is included in an executed insurance contract.  Accordingly, CNA Insurers deny the allegations in Paragraph 33.

34.     Given the limits of the underlying policies, the Continental Policy is expected to be implicated in resolving Clergy Abuse Claims that implicate Continental's policy years.

**ANSWER:**   Paragraph 34 fails to identify whose expectations it is asserting.  To the extent that Paragraph 34 reflects the expectations of the Archdiocese, CNA Insurers lack sufficiently information to admit or deny the allegations in Paragraph 34.  To the extent that Paragraph 34 reflects the expectations of Continental Casualty, CNA Insurers deny the allegations in Paragraph 34.

**Hartford**

35.     Hartford issued primary insurance coverage to the Archdiocese, including Policy No. 41C549216 for the period August 1, 1970 – August 1, 1973 (the "Hartford Policy").  The Hartford Policy provides limits of $100,000 per person, with no aggregate limits. Hartford agrees to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of … bodily injury … to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury … even if any of the allegations of the suit are groundless, false or fraudulent…"

**ANSWER:**   CNA Insurers lack sufficient knowledge or information to admit or deny the allegations in Paragraph 35.

**American Home**

36.    American Home issued various policies of insurance to the Archdiocese, including Umbrella Policy No. CE2598055 for the period August 17, 1969 – August 17, 1972 and Umbrella Policy No. BE3374208 for the period August 17, 1972 – August 17, 1975 (together the "American Home Policies") which sit above certain primary policies from August 1969 to August 1975.  American Home agrees "[t]o pay on behalf of the insured the ultimate net loss in excess of the retained limit hereinafter defined, which the insured shall become legally obligated to pay as damages by reason of the liability imposed upon the insured by law… because of …Personal Injury … as defined herein and caused by or arising out of an occurrence." "Personal Injury" is defined in pertinent part as "bodily injury, sickness, disease, disability, shock, fright, mental anguish and mental injury ... ." Personal Injury also includes "assault or battery not committed by or at the direction of the insured … ."

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or deny the allegations in Paragraph 36.

37.    Policy No. CE2598055 provides $3 million in umbrella coverage for each occurrence with no aggregate limit applicable to the Clergy Abuse Claims.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or deny the allegations in Paragraph 37.

38.    Pursuant to Endorsement 7, Policy No. BE 3374208, the policy provides $5 million in coverage per occurrence per year with no aggregate limit applicable to the Clergy Abuse Claims.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or deny the allegations in Paragraph 38.

39.    Given the limits of the underlying policies, the American Home Policies are expected to be implicated in resolving Clergy Abuse Claims that implicate American Home's policy years.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or deny the allegations in Paragraph 39.

**Aetna**

40.     Aetna issued various policies of insurance to the Archdiocese, including primary policies consisting of Policy Nos. 37AL188420 for the period August 1, 1973 – August 1, 1974, 37SM802875FCA for the period August 1, 1974 – August 1, 1977, 37SM802875FCA7 for the period August 1, 1977 – August 1, 1978, 37SM10285FCA for the period August 1, 1978 – August 1, 1979, and 37SM15868FCA for the period August 1, 1979 – July 1, 1980 (collectively the "Aetna Primary Policies"), and umbrella policies consisting of Policy Nos. 37XS1768WCA for the period August 17, 1975 – August 17, 1976, 37XS2046WCA for the period August 17, 1976 – August 17, 1977, 37XS2401WCA for the period August 17, 1977 – August 17, 1978, 37XS2831WCA, upon information and belief, for the period August 17, 1978 – July 1, 1979, and 37XS3399WCA for the period July 1, 1979 – July 1, 1980 (collectively the "Aetna Umbrella Policies") (the Aetna Primary Policies and the Aetna Umbrella Policies together the "Aetna Policies").

**ANSWER:**     CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 40.

41.     In the Aetna Primary Policies, Aetna agreed to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend … even if any of the allegations of the suit are groundless, false or fraudulent … ." In the Aetna Umbrella Policies, Aetna agreed to "indemnify the insured for ultimate net loss in excess of the applicable underlying limit which the insured shall become legally obligated to pay as damages because of ... Personal Injury … ." "'[P]ersonal injury' means bodily injury, shock, mental anguish, sickness or disease, including death at any time resulting therefrom … ."

**ANSWER:**     CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 41.

42.     Each Aetna Primary Policy provides $500,000 in limits per occurrence per year, except for Policy No. 37AL188420, which provides $300,000 per occurrence, with no applicable aggregate limit.   Aetna Umbrella Policy Nos. 37XS1768WCA and 37XS2046WCA each provide $5 million in limits per occurrence per year. Aetna Umbrella Policy Nos. 37XS2401WCA and 37XS3399WCA each provide $3 million in limits per occurrence per year with no applicable aggregate limits.   Upon information

and belief, Aetna Umbrella Policy No. 37XS2831 also provides $3 million in limits per occurrence per year with no applicable aggregate limit.

      **ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 42.

      43.    Given the limits of the underlying policies, the Aetna Umbrella Policies are expected to be implicated in resolving Clergy Abuse Claims that implicate Aetna's policy years.

      **ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 43.

**London Market Insurers**

      44.    For the period September 1, 1980 – September 1, 1983, the first layer of coverage was provided in part by Certain Underwriters at Lloyd's, London subscribing to Policy No. SL3721 and in part by Bellefonte, Excess, and Terra Nova under Policy No. SLC5742. For this period, excess coverage was provided by Certain Underwriters at Lloyd's, London subscribing to Policy No. SL3722, and additional excess coverage was provided in part by Certain Underwriters at Lloyd's, London subscribing to Policy No. SL3723 and in part by Dominion, Sovereign, and Stronghold under Policy No. SLC5744.

      **ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 44.

      45.    For the period September 1, 1983 – September 1, 1986, the first layer of coverage was provided in part by Certain Underwriters at Lloyd's, London subscribing to Policy No. ISL3115 and in part by Excess, Terra Nova, Yasuda, and Sphere Drake under Policy No. ICO4074. For this period, excess coverage was provided by Certain Underwriters at Lloyd's, London subscribing to Policy No. ISL3116, Certain Underwriters at Lloyd's, London subscribing to Policy No. ISL3117, and Certain Underwriters at Lloyd's, London subscribing to Policy No. ISL3675.

      **ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 45.

46.     For the period September 1, 1986 – September 1, 1987, the first layer of coverage was provided in part by Certain Underwriters at Lloyd's, London subscribing to Policy No. ISL3613 and in part by CNA London under Policy No. ICO5387.  For the same period, excess coverage was provided by Certain Underwriters at Lloyd's, London subscribing to Policy No. ISL3614 and Certain Underwriters at Lloyd's, London subscribing to Policy No. ISL3615.

**ANSWER:**     CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 46.

47.     The policies comprising the first layer of coverage of London Market Insurers provide that the Insurers "agree …, to indemnify the assured for all sums which the Assured shall be obligated to pay by reason of the liability imposed upon the Assured …, for damages direct or consequential, and expenses, all as more fully defined by the term 'ultimate net loss', on account of personal injuries … arising out of any occurrence …"  In those policies, Personal Injuries means "Bodily Injury, Mental Injury, Mental Anguish, Shock, Sickness, Disease, Disability, …, Humiliation, Invasion of Right of Privacy … ."  The policies comprising the first layer of coverage of the London Market Insurers provide coverage after applicable retentions are satisfied by the Archdiocese.

**ANSWER:**     CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 47.

48.     In addition, the first layer of coverage provided by the London Market Insurers contain additional coverage reimbursing the Archdiocese for retention amount paid by the Archdiocese in excess of the Archdiocese's loss fund.

**ANSWER:**     CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 48.

**Interstate**

49.     Interstate issued various policies of insurance to the Archdiocese, including Policy No. 183152670 for the period September 1, 1980 – September 1, 1984 and Policy No. 830170075 for the period September 1, 1984 – September 1, 1985 (the "Interstate Policies"), which sit over the corresponding Lloyd's Primary Policies and provide coverage in the amount of the difference between underlying including self-

insured retention and $5 million per occurrence, and Policy No. 830172570, which provides coverage in the amount of the difference between underlying including self-insured retention and $1 million of coverage per occurrence.

>    **ANSWER:**     CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 49.

>    50.     Given the limits of the underlying policies, the Interstate Policies are expected to be implicated in resolving Clergy Abuse Claims that implicate Interstate's policy years.

>    **ANSWER:**     CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 50.

## Colonial Penn

>    51.     Colonial Penn issued insurance to the Archdiocese, including Policy No. XL150030 for the period September 1, 1985 – September 1, 1986 (the "Colonial Penn Policy") that sits above certain Bishop's Plan policies.  Upon information and belief, the Colonial Penn Policy provides coverage for the type of injury alleged by the Clergy Abuse Claimants.

>    **ANSWER:**     CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 51.

>    52.     The Colonial Penn Policy provides $4 million in coverage excess of $1 million for each occurrence with no aggregate limit applicable to the Clergy Abuse Claims.

>    **ANSWER:**     CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 52.

>    53.     Given the limits of the underlying policies, the Colonial Penn Policy is expected to be implicated in resolving the Clergy Abuse Claims that implicate Colonial Penn's policy years.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 53.

**The Disputes**

54.    The policies issued by each Carrier and referred to above are collectively
referred to as the "Policies."  All conditions precedent have been met with respect to
each of the Policies.

**ANSWER:**    CNA Insurers deny that all conditions precedent have been met

with respect to the alleged F&C, NFIC, and Continental Casualty policies.  CNA

Insurers lack sufficient knowledge or information to admit or deny the allegations in

Paragraph 54 as they pertain to other Carriers.  CNA Insurers admit that the

Archdiocese collectively refers to the policies listed in the Complaint as the "Policies."

55.    The Archdiocese has tendered to the Carriers the Clergy Abuse Claims
that implicate each Carriers' respective policy periods.  Each Carrier has reserved its
rights to deny coverage for the Clergy Abuse Claims on multiple grounds as more
specifically delineated in their respective reservation of rights letters.  Grounds for
denials include, but are not limited to, that there is no accident or occurrence because
the injury was expected or intended or not fortuitous; and that there is no bodily injury.
In addition, disputes exist with several Carriers concerning the policy attachment points
and the limits of liability of the Policies as they apply to the Clergy Abuse Claims, the
"trigger" method applicable to the Clergy Abuse Claims, and the method of allocation
of liability for the Clergy Abuse Claims where more than one policy or policy year is
triggered in a Clergy Abuse Claim.  In addition, several Carriers denied coverage on the
ground that policies do not exist and that the Notices of Claim do not constitute "suits."

**ANSWER:**    CNA Insurers admit that the Archdiocese has tendered Clergy

Abuse Claims to CNA Insurers.  CNA Insurers further admit they have reserved their

right to deny coverage of the Clergy Abuse Claims on multiple grounds, as set forth in

their reservation of rights letters, including those listed in Paragraph 55.  CNA Insurers

lack sufficient knowledge or information to admit or deny the allegations in Paragraph

55 as they pertain to other Carriers.  CNA Insurers deny that all Clergy Abuse Claims

tendered to CNA Insurers implicate the alleged F&C, NFIC, or Continental Casualty

polices.

### COUNT ONE – DECLARATORY JUDGMENT (All Defendants)

56.    The Archdiocese realleges and incorporates paragraph 1 through 55 as if
fully set forth herein.

**ANSWER:**    CNA Insurers restate and incorporate by reference their prior

responses as though fully set forth herein.

57.    The Carriers have refused to confirm that they will provide indemnity and
defense in connection with the Clergy Abuse Claims.

**ANSWER:**    CNA Insurers admit that they have reserved their rights to deny

coverage of the Clergy Abuse Claims.  CNA Insurers lack sufficient knowledge or

information to admit or deny the allegations in Paragraph 57 as they pertain to other

Carriers.

58.    Based upon the Carriers' reservation of rights letters, the bases for
refusing to defend and indemnify the Archdiocese include that the Clergy Abuse
Claims do not seek damages because of bodily injury, and that the Clergy Abuse Claims
are not "accidents" or "occurrences" as those terms are used in each of the Carriers'
policies because the harm was expected or intended.

**ANSWER:**    CNA Insurers admit that they have reserved their rights to deny

coverage of the Clergy Abuse Claims on multiple grounds, which have been set forth in

their reservation of rights letters, including those listed in Paragraph 58.  CNA Insurers

deny that they have denied defense or indemnification of any claims because the Clergy

Abuse Claims do not seek damages because of bodily injury or because the Clergy

Abuse Claims are not "accidents" or "occurrences" or because the harm was expected

or intended.  CNA Insurers lack sufficient knowledge or information to admit or deny

the allegations in Paragraph 58 as they pertain to other Carriers.

59.     An actual controversy of a justiciable nature currently exists between the Archdiocese and its Carriers concerning the Carriers' obligations under the Policies.

**ANSWER:**     CNA Insurers admit the allegations in Paragraph 59 directed at

CNA.  CNA Insurers lack sufficient knowledge or information to admit or deny the

allegations as they pertain to other Carriers.

60.     Pursuant to 28 U.S.C. § 2201, the Archdiocese is entitled to a declaration as follows:

    a)     With respect to each Clergy Abuse Claim that triggers a Carrier's policy period, that as to such Clergy Abuse Claim and such Policy,

        i)     The injuries described in each Clergy Abuse Claim constitute bodily or personal injury, and the damages sought in each Clergy Abuse Claim are because of bodily or personal injury.

        ii)     The bodily injury/personal injury alleged in each Clergy Abuse Claim was caused by "accident" or "occurrence" as those terms are used in each of the Carriers' Policies.

        iii)     No exclusions apply to limit coverage for the Clergy Abuse Claims.

        iv)     The appropriate trigger of coverage for the Clergy Abuse Claims.

        v)     The method of allocation of liability the Archdiocese may have, if any, in connection with the Clergy Abuse Claims among triggered policy years.

vi)     Each Carrier has, or will have upon satisfaction of any
retained limit, a duty to indemnify the Archdiocese for
damages paid in the form of verdicts, judgments or
settlements, and defense costs incurred in connection with
the Clergy Abuse Claims.

vii)    Each primary Carrier has a duty to defend and indemnify
the Archdiocese in connection with the Clergy Abuse
Claims.

b)     Each Carrier shares responsibility for (i) fees incurred to achieve a
global settlement with plaintiffs' attorney Jeff Anderson's clients;
and (ii) legal fees and expenses incurred by the Archdiocese in
responding to the Carriers' request for documentation relating to
the Clergy Abuse Claims.

**ANSWER:**     CNA Insurers admit that the Archdiocese seeks declaratory relief in

Paragraph 60 but denies that the Archdiocese is entitled to this or any other relief.

## COUNT TWO – DECLARATORY JUDGMENT
### (Additional Allegations Specific to F&C)

61.     The Archdiocese realleges and incorporates paragraph 1 through 60 as if
fully set forth herein.

**ANSWER:**     CNA Insurers restate and incorporate by reference their prior

responses as though fully set forth herein.

62.     F&C has denied the issuance of Policy No. XP74084 and has not confirmed
the terms of Policy No. XP128258.

**ANSWER:**     CNA Insurers admit that they do not have sufficient evidence of

the existence or material terms and conditions of alleged Policy No. XP74084 but deny

that they have denied the issuance of this policy.  CNA Insurers admit that they have

not confirmed the terms of alleged Policy No. XP128258.

63.     An actual controversy of a justiciable nature currently exists between the Archdiocese and F&C concerning the existence and terms and conditions of Policy No. XP74084 and the terms and conditions of Policy No. XP128258.

**ANSWER:**    CNA Insurers admit the allegations in Paragraph 63.

64.     Pursuant to 28 U.S.C. § 2201, the Archdiocese is entitled to a declaration as follows:

a)     F&C Policy No. XP74084 provides bodily injury coverage for the period August 1, 1949 – August 1, 1952, with applicable limits of $100,000 per person per year with no aggregate limits.

b)     F&C Policy No. XP128258 provides bodily injury coverage for the period August 1, 1952 – August 1, 1955, with limits of $100,000 per person per year with no aggregate limits.

c)     The Archdiocese seeks a declaration of the terms and conditions of each F&C Policy.

**ANSWER:**    CNA Insurers deny the allegations in Paragraph 64.

## COUNT THREE – DECLARATORY JUDGMENT
### (Additional Allegations Specific to FFIC)

65.     The Archdiocese realleges and incorporates paragraph 1 through 64 as if fully set forth herein.

**ANSWER:**    CNA Insurers restate and incorporate by reference their prior

responses as though fully set forth herein.

66.     FFIC has refused to confirm the issuance and the terms of the FFIC Policies, and has refused to confirm that the policies provide coverage for the Archdiocese relating to Clergy Abuse Claims.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 66.

67.     An actual controversy of a justiciable nature currently exists between the Archdiocese and FFIC regarding the foregoing.

**ANSWER:**     CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 67.

68.     Pursuant to 28 U.S.C. § 2201, the Archdiocese is entitled to a declaration as follows:

a)     FFIC Policy No. GAC312672 provides bodily injury coverage for the period August 1, 1955 – August 1, 1958, with applicable limits of $100,000 per person per year with no aggregate limits.

b)     FFIC Policy No. CL331931 provides bodily injury coverage for the period August 1, 1958 – August 1, 1961, with applicable limits of $100,000 per person per year with no aggregate limits.

c)     Both FFIC Policies provide coverage to the Archdiocese for all sums the Archdiocese is legally obligated to pay as damages because of bodily injury, including the Clergy Abuse Claims, arising from accidents occurring within the United States, Canada and Newfoundland. Neither the Endorsement limiting coverage for "parishes" only to those listed, nor any list of locations, operate to constrict coverage for the Archdiocese.

**ANSWER:**     CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 68.

## COUNT FOUR – DECLARATORY JUDGMENT
### (Additional Allegations Specific to NFIC)

69.     The Archdiocese realleges and incorporates paragraph 1 through 68 as if fully set forth herein.

**ANSWER:**     CNA Insurers restate and incorporate by reference their prior

responses as though fully set forth herein.

70.     NFIC has refused to confirm that the NFIC Policy provides coverage for the Archdiocese relating to Clergy Abuse Claims.

**ANSWER:**     CNA Insurers admit that they have not confirmed that the NFIC

homeowner's policy provides coverage for the Archdiocese relating to Clergy Abuse

Claims.

71.     An actual controversy of a justiciable nature currently exists between the
Archdiocese and NFIC regarding the foregoing.

**ANSWER:**     CNA Insurers admit the allegations in Paragraph 71.

72.     Pursuant to 28 U.S.C. § 2201, the Archdiocese is entitled to a declaration as
follows:

a)     NFIC Policy No. HO4527587 provides to the Archdiocese $500,000
in bodily injury coverage per occurrence per year for each year
August 16, 1963 – August 16, 1966 with no aggregate limits. Each
Clergy Abuse Claim constitutes one occurrence of bodily injury for
each year in which an incident of abuse occurred.

**ANSWER:**     CNA Insurers deny the allegations in Paragraph 72.

## COUNT FIVE – DECLARATORY JUDGMENT
## (Additional Allegations Specific to International)

73.     The Archdiocese realleges and incorporates paragraph 1 through 72 as if
fully set forth herein.

**ANSWER:**     CNA Insurers restate and incorporate by reference their prior

responses as though fully set forth herein.

74.     International has refused to confirm the terms and conditions of the
International Policy and has refused to confirm that the International Policy provides
coverage for the Clergy Abuse Claims.

**ANSWER:**     CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 74.

75.     An actual controversy of a justiciable nature currently exists between the
Archdiocese and International regarding the foregoing.

**ANSWER:**     CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 75.

76.     Pursuant to 28 U.S.C. § 2201, the Archdiocese is entitled to a declaration as follows:

a)     The International Policy provides bodily injury coverage for the period August 1, 1967 – August 1, 1970, with applicable limits of $100,000 per person per year, with no applicable aggregate limit.

**ANSWER:**     CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 76.

## COUNT SIX – DECLARATORY JUDGMENT
### (Additional Allegations Specific to Continental)

77.     The Archdiocese realleges and incorporates paragraph 1 through 76 as if fully set forth herein.

**ANSWER:**     CNA Insurers restate and incorporate by reference their prior

responses as though fully set forth herein.

78.     Continental has refused to confirm the issuance and the terms of the Continental Policy and has refused to confirm that the policies provide coverage for the Archdiocese relating to Clergy Abuse Claims.

**ANSWER:**     CNA Insurers admit that they have not confirmed the issuance or

terms of the alleged Continental Casualty umbrella policy or that the alleged umbrella

policy provides coverage to the Archdiocese for the Clergy Abuse Claims.

79.     An actual controversy of a justiciable nature currently exists between the Archdiocese and Continental regarding the foregoing.

**ANSWER:**     CNA Insurers admit the allegations in Paragraph 79.

80.     Pursuant to 28 U.S.C. § 2201, the Archdiocese is entitled to a declaration as follows:

a) The Continental Policy provides bodily injury coverage for the period August 17, 1966 – August 17, 1969 with $3 million in limits excess of underlying insurance ($100,000) per person per year with no applicable aggregate limits.

b) The Archdiocese seeks a declaration of the terms and conditions of the Continental Policy, including that the Continental Policy includes Insuring Agreement P1-40103-A.

**ANSWER:** CNA Insurers deny the allegations in Paragraph 80.

## COUNT SEVEN – DECLARATORY JUDGMENT
### (Additional Allegations Specific to Hartford)

81. The Archdiocese realleges and incorporates paragraph 1 through 80 as if fully set forth herein.

**ANSWER:** CNA Insurers restate and incorporate by reference their prior responses as though fully set forth herein.

82. Hartford has refused to confirm the terms of the Hartford Policy and has refused to confirm that the policies provide coverage for the Archdiocese relating to Clergy Abuse Claims.

**ANSWER:** CNA Insurers lack sufficient knowledge or information to admit or deny the allegations in Paragraph 82.

83. An actual controversy of a justiciable nature currently exists between the Archdiocese and Hartford regarding the foregoing.

**ANSWER:** CNA Insurers lack sufficient knowledge or information to admit or deny the allegations in Paragraph 83.

84. Pursuant to 28 U.S.C. § 2201, the Archdiocese is entitled to a declaration as follows:

a) The Hartford Policy provides bodily injury coverage for the period August 1, 1970 – August 1, 1973, with applicable limits of $100,000 per person per year, with no applicable aggregate limits.

27

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or deny the allegations in Paragraph 84.

### COUNT EIGHT – DECLARATORY JUDGMENT
### (Additional Allegations Specific to American Home)

85.    The Archdiocese realleges and incorporates paragraph 1 through 84 as if fully set forth herein.

**ANSWER:**    CNA Insurers restate and incorporate by reference their prior responses as though fully set forth herein.

86.    American Home has refused to confirm the terms of the American Home Policies and has refused to confirm that the policies provide coverage for the Archdiocese relating to Clergy Abuse Claims.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or deny the allegations in Paragraph 86.

87.    An actual controversy of a justiciable nature currently exists between the Archdiocese and American Home regarding the foregoing.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or deny the allegations in Paragraph 87.

88.    Pursuant to 28 U.S.C. § 2201, the Archdiocese is entitled to a declaration as follows:

a)    American Home Policy No. CE2598055 provides $3 million in limits per occurrence per year excess $100,000 per person underlying limits, for each year August 17, 1969 – August 17, 1972.

b)    As amended by Endorsement #7, American Home Policy No. BE3374208 provides $5 million in limits per occurrence per year excess $100,000 per person underlying limits, for each year August 17, 1972 – August 17, 1975.

c)      Each Clergy Abuse Claim constitutes one occurrence of bodily
injury for each year in which an incident of abuse occurred. No
aggregate limit applies to the Clergy Abuse Claims under either of
the American Home Policies.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 88.

## COUNT NINE – DECLARATORY JUDGMENT
### (Additional Allegations Specific to Aetna)

89.     The Archdiocese realleges and incorporates paragraph 1 through 88 as if
fully set forth herein.

**ANSWER:**    CNA Insurers restate and incorporate by reference their prior

responses as though fully set forth herein.

90.     Aetna has refused to confirm the terms of the Aetna Policies and has
refused to confirm that the policies provide coverage for the Archdiocese relating to
Clergy Abuse Claims.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 90.

91.     An actual controversy of a justiciable nature currently exists between the
Archdiocese and Aetna regarding the foregoing.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 91.

92.     Pursuant to 28 U.S.C. § 2201, the Archdiocese is entitled to a declaration as
follows:

a)      Aetna Policy No. 37AL188420 provides $300,000 in bodily injury
coverage per occurrence per year for each year August 1, 1973 –
August 1, 1974. The other Aetna Primary Policies 37SM802875FCA
for the period August 1, 1974 – August 1, 1977, 37SM802875FCA7
for the period August 1, 1977 – August 1, 1978, 37SM10285FCA for

the period August 1, 1978 – August 1, 1979, and 37SM15868FCA for the period August 1, 1979 – July 1, 1980 each provide $500,000 in bodily injury coverage per occurrence per year for their respective coverage years.

b)  Aetna Policy No. 37XS1768WCA and Aetna Policy No. 37XS2046WCA each provide $5 million in limits per occurrence per year excess $500,000 per occurrence underlying limits, for their respective coverage years (August 17, 1975 – August 17, 1976 and August 17, 1976 – August 17, 1977). Aetna Policy No. 37XS2401WCA, and Aetna Policy No. 37XS2831WCA, and Aetna Policy No. 37XS3399WCA each provide $3 million in limits per occurrence per year excess $500,000 per occurrence underlying limits, for their respective coverage years (August 17, 1977 – August 17, 1978, August 17, 1978 – July 1, 1979, and July 1, 1979 – July 1, 1980).

c)  Each Clergy Abuse Claim constitutes one occurrence of bodily injury for each year in which an incident of abuse occurred. No aggregate limits in any of the Aetna Policies apply to the Clergy Abuse Claims.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 92.

## COUNT TEN – DECLARATORY JUDGMENT
### (Additional Allegations Specific to London Market Insurers)

93.    The Archdiocese realleges and incorporates paragraph 1 through 92 as if fully set forth herein.

**ANSWER:**    CNA Insurers restate and incorporate by reference their prior

responses as though fully set forth herein.

94.    The London Market Insurers have refused to confirm that the London Market Insurers' Policies provide coverage for the Archdiocese relating to Clergy Abuse Claims and have refused to confirm the status of exhaustion of the retention in the policies comprising the first layer of coverage in the London Market Insurers' Policies and whether the London Market Insurers have fully paid amounts due under the "Aggregate Agreement" insurance. In addition, the Archdiocese and the London

Market Insurers disagree as to the terms and conditions of the London Market Insurers'
Policies.

     **ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 94.

     95.    An actual controversy of a justiciable nature currently exists between the
Archdiocese and the London Market Insurers regarding the foregoing.

     **ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 95.

     96.    Pursuant to 28 U.S.C. § 2201, the Archdiocese is entitled to a declaration as
follows:

     a)    A declaration as to the application of the terms and conditions of
each of the London Market Insurers' Policies.

     b)    The Archdiocese's retentions under the policies comprising the first
layer of coverage in the London Market Insurers' Policies have
been exhausted for certain policy years, including the September 1,
1980 – September 1, 1981 policy year, the September 1, 1981 –
September 1, 1982 policy year, and the September 1, 1983 –
September 1, 1984 policy year.

     c)    The meaning of the "per loss" limits of the London Market
Insurers' First Layer Policies.

     d)    The application of the London Market Insurers' Policies to the
Clergy Abuse Claims.

     e)    Endorsement No. 8 in Policy No. ISL 3613 and Policy No. ICO 5387
does not apply to the Clergy Abuse Claims.

     **ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 96.

## COUNT ELEVEN – DECLARATORY JUDGMENT
### (Additional Allegations Specific to Interstate)

97.     The Archdiocese realleges and incorporates paragraph 1 through 96 as if fully set forth herein.

**ANSWER:**    CNA Insurers restate and incorporate by reference their prior

responses as though fully set forth herein.

98.     Interstate has refused to confirm that the Interstate Policies provide coverage for the Archdiocese relating to Clergy Abuse Claims.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 98.

99.     An actual controversy of a justiciable nature currently exists between the Archdiocese and Interstate regarding the foregoing.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 99.

100.    Pursuant to 28 U.S.C. § 2201, the Archdiocese is entitled to a declaration as follows:

a)    Interstate Policy Nos. 183152670 and 830170075 provide coverage in the amount of the difference between underlying including retention and $5 million per occurrence for damages from bodily injury with no aggregate limits.

b)    Interstate Policy No. 830172570 provides coverage in the amount of the difference between underlying including self-insured retention and $1 million per occurrence.

c)    Endorsement No. 3 in Interstate Policy No. 830172570 does not apply to the Clergy Abuse Claims.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 100.

## COUNT TWELVE – DECLARATORY JUDGMENT
### (Additional Allegations Specific to Colonial Penn)

101.    The Archdiocese realleges and incorporates paragraph 1 through 100 as if fully set forth herein.

**ANSWER:**    CNA Insurers restate and incorporate by reference their prior

responses as though fully set forth herein.

102.    Colonial Penn has refused to confirm that the Colonial Penn Policy provides coverage for the Archdiocese relating to Clergy Abuse Claims.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 102.

103.    An actual controversy of a justiciable nature currently exists between the Archdiocese and Colonial Penn regarding the foregoing.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 103.

104.    Pursuant to 28 U.S.C. § 2201, the Archdiocese is entitled to a declaration as follows:

a)    A declaration as to the terms and conditions of the Colonial Penn Policy.

b)    Colonial Penn Policy No. XL150030 provides $4 million in limits per occurrence per year excess $1 million for each year September 1, 1985 – September 1, 1986.

c)    Each Clergy Abuse Claim constitutes one occurrence of bodily injury for each year in which an incident of abuse occurred.

d)    Endorsement No. 2 in the Colonial Penn Policy does not apply to the Clergy Abuse Claims.

**ANSWER:**    CNA Insurers lack sufficient knowledge or information to admit or

deny the allegations in Paragraph 104.

## COUNT THIRTEEN – INJUNCTIVE AND OTHER ANCILLARY RELIEF

105.    The Archdiocese realleges and incorporates paragraph 1 through 104 as if fully set forth herein.

**ANSWER:**    CNA Insurers restate and incorporate by reference their prior

responses as though fully set forth herein.

106.    The Archdiocese is entitled to injunctive and other ancillary relief necessary to preserve this Court's jurisdiction over the parties and the issues herein and to aid in the enforcement of the declaratory relief, and requests additional judgment as appropriate.

**ANSWER:**    CNA Insurers deny the allegations in Paragraph 106.

## AFFIRMATIVE DEFENSES

Subject to and without waiving any response set forth above, CNA Insurers

hereby set forth their separate and distinct defenses to the Complaint.  CNA Insurers set

forth the following matters to apprise the Archdiocese of certain potentially applicable

defenses.  By listing any matter as an affirmative defense, CNA Insurers do not assume

the burden of proving any matter upon which the Archdiocese bears the burden of

proof under applicable law:

### FIRST AFFIRMATIVE DEFENSE
### (Policy Terms, Exclusions, Conditions, and Limitations)

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage

obligations with regard to the underlying Clergy Abuse Claims, such coverage may be

barred, in whole or in part, by the terms, exclusions, conditions, limitations, and other

provisions contained in or incorporated by reference in the insurance policies that the

Archdiocese alleges CNA Insurers issued to it (the "Alleged Policies").

## SECOND AFFIRMATIVE DEFENSE
### (Events Do Not Constitute an Occurrence(s))

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage

obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in

whole or in part, to the extent that the events giving rise to the Clergy Abuse Claims do

not constitute an "accident" or "occurrence" within the meaning of that term as defined

in the Alleged Policies.

## THIRD AFFIRMATIVE DEFENSE
### (Expected or Intended Injury or Damage)

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage

obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in

whole or in part, to the extent that the Archdiocese expected or intended the injury or

damage alleged in the Clergy Abuse Claims.

## FOURTH AFFIRMATIVE DEFENSE
### (Intentional Conduct)

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage

obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in

whole or in part, to the extent that the Archdiocese seeks coverage for damages

resulting from its intentional or willful conduct.

## FIFTH AFFIRMATIVE DEFENSE
### (Violation of Law and/or Public Policy)

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage

obligations with regard to the Clergy Abuse Claims, coverage may be barred, in whole

or in part, to the extent that the Archdiocese seeks coverage under the Alleged Policies

for its acts or failures to act that were in violation of law and/or public policy.

### SIXTH AFFIRMATIVE DEFENSE
**(Insurance Provided in Reliance upon Misrepresentations or Omissions)**

To the extent that the Archdiocese or its agents, representatives or brokers failed

to disclose, concealed, misrepresented or omitted material information or facts pertinent

to the risks undertaken by CNA Insurers, including but not limited to knowledge that

certain priests of the Archdiocese had sexually molested minors in a manner that could

result in claims against the Archdiocese, the Alleged Policies are void *ab initio*.  CNA

Insurers reserve the right to seek rescission or reformation of the Alleged Policies if facts

disclosed in discovery so warrant.

### SEVENTH AFFIRMATIVE DEFENSE
**(No Coverage for Fines or Penalties)**

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage

obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in

whole or in part, to the extent that the Archdiocese seeks coverage for statutory, civil, or

criminal fines or penalties.

### EIGHTH AFFIRMATIVE DEFENSE
**(Punitive Damages)**

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage

obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in

whole or in part, to the extent that the Archdiocese seeks coverage for punitive damages awarded against the Archdiocese.

### NINTH AFFIRMATIVE DEFENSE
**(Pre-Existing Condition; Fortuity)**

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in whole or in part, to the extent that the Archdiocese's claims and alleged damages arise out of conditions that existed, or an accident or occurrence that was underway, at the time the Alleged Policies were issued to the Archdiocese.

### TENTH AFFIRMATIVE DEFENSE
**(Damage Not Within Policy Periods)**

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in whole or in part, to the extent that the Archdiocese seeks coverage for damages or injury occurring prior to or after each alleged CNA Insurer's policy period.

### ELEVENTH AFFIRMATIVE DEFENSE
**(Named Insureds)**

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in whole or in part, to the extent that damages in the Clergy Abuse Claims are attributable to entities that were not named insureds or "insureds" as defined in the Alleged Policies.

### TWELFTH AFFIRMATIVE DEFENSE
**(Voluntary Payments; Assumed Obligations; Incurred Expenses)**

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage

obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in

whole or in part, to the extent that the Archdiocese seeks coverage for voluntary

payments, assumed obligations and/or incurred expenses.

### THIRTEENTH AFFIRMATIVE DEFENSE
**(Limits of Liability)**

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage

obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in

whole or in part, by application of the Alleged Policies' limits of liability, including

limits per person, per accident, per occurrence, and/or in the aggregate, all as set forth

in the Alleged Policies.

### FOURTEENTH AFFIRMATIVE DEFENSE
**(Missing or Incomplete Policies)**

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage

obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in

whole or in part, to the extent that the Archdiocese is unable to meet its burden of

proving the material terms and conditions of the Alleged Policies.

### FIFTEENTH AFFIRMATIVE DEFENSE
**(No Bodily Injury)**

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage

obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in

whole or in part, to the extent that the Archdiocese fails to prove the Clergy Abuse Claims allege and involve "bodily injury" within the meaning of the Alleged Policies, resulting from acts or omissions of the Archdiocese.

**SIXTEENTH AFFIRMATIVE DEFENSE**
**(Notice of Occurrence)**

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in whole or in part, by the Archdiocese's failure to provide timely notice of accident or occurrence as required by the Alleged Policies.

**SEVENTEENTH AFFIRMATIVE DEFENSE**
**(Notice of Claim)**

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in whole or in part, by the Archdiocese's failure to provide timely notice of claims as required by the Alleged Policies.

**EIGHTEENTH AFFIRMATIVE DEFENSE**
**(Loss Payable – No Action)**

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage obligations with regard to the Underlying Cases, such coverage may be barred, in whole or in part, to the extent that amounts for which the Archdiocese seeks coverage were not finally determined either by judgment against the Archdiocese after actual trial, or by written agreement of the Archdiocese, the claimant, and CNA Insurers.

## NINETEENTH AFFIRMATIVE DEFENSE
### (Allocation)

In the event the Court finds coverage under the Alleged Policies, whether in whole or in part, CNA Insurers are entitled to have liability allocated, whether in whole or in part, to other responsible insurers, including, without limitation, any self-insured retentions deductibles, and/or uninsured periods for which the Archdiocese is responsible.

## TWENTIETH AFFIRMATIVE DEFENSE
### (Failure to Cooperate)

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in whole or in part, to the extent that the Archdiocese has breached provisions of the Alleged Policies requiring the insured's assistance and cooperation.

## TWENTY-FIRST AFFIRMATIVE DEFENSE
### (Other Insurance)

To the extent that the Complaint seeks a declaration of CNA Insurers' coverage obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in whole or in part, by the "other insurance" provisions in the Alleged Policies.

## TWENTY-SECOND AFFIRMATIVE DEFENSE
### (Exhaustion)

To the extent that the Complaint seeks a declaration of CNA Insurers' excess coverage obligations with regard to the Clergy Abuse Claims, such coverage may be barred, in whole or in part, because underlying insurance has not been exhausted.

### TWENTY-THIRD AFFIRMATIVE DEFENSE
### (Expenses Covered by Underlying Insurance)

To the extent that the Complaint seeks a declaration of CNA Insurers' excess

coverage obligations with regard to the Clergy Abuse Claims, such coverage may be

barred, in whole or in part, to the extent that the Archdiocese seeks coverage for

expenses of settlement, adjustment, investigation, or defense of claims that are covered

by underlying insurance.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE
### (Underlying Insolvency)

To the extent that the Complaint seeks a declaration of CNA's excess coverage

obligations with regard to the Clergy Abuse Claims, and, to the extent that any

insurance underlying the Alleged Policies was issued by an insurance carrier that is

now or in the future becomes insolvent, the Alleged Policies do not "drop down" to

provide coverage at a lower attachment level than that stated in the policies.

### TWENTY-FIFTH AFFIRMATIVE DEFENSE
### (Laches)

The Archdiocese's claims and the Clergy Abuse Claims may be barred, in whole

or in part, by the doctrine of laches.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE
### (Equitable Estoppel)

The Archdiocese's claims and the Clergy Abuse Claims may be barred, in whole

or in part, by the doctrine of equitable estoppel.

### TWENTY-SEVENTH AFFIRMATIVE DEFENSE
### (Waiver)

The Archdiocese's claims and the Clergy Abuse Claims may be barred, in whole or in part, by the doctrine of waiver.

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE
### (Judicial Estoppel)

The Archdiocese's claims and the Clergy Abuse Claims may be barred, in whole or in part, by the doctrine of judicial estoppel.

### TWENTY-NINTH AFFIRMATIVE DEFENSE
### (Insufficient Pleading)

The Archdiocese has not pled its allegations with sufficient particularity to permit CNA Insurers to determine all applicable defenses. Therefore, CNA Insurers reserve the right to assert additional defenses once all such information, including complete copies of all insurance policies, are obtained through discovery and investigation. CNA Insurers also reserve the right to rely upon any affirmative defense stated by another defendant.

### CROSS-CLAIMS, COUNTERCLAIMS AND THIRD-PARTY COMPLAINT FOR DECLARATORY RELIEF

Cross-Claimants, Counterclaimants, and Third-Party Plaintiffs The Continental Insurance Company ("CIC"), successor by merger to The Fidelity and Casualty Company of New York ("F&C"), Continental Casualty Company ("Continental Casualty") and National Fire Insurance Company of Hartford ("NFIC"), (collectively "CNA Insurers"), allege the following:

1.      In May 2013, following lobbying by victims' rights groups such as the National Center for the Victims of Crime and the Minnesota Coalition Against Sexual Assault, as well as claimants' attorney Jeff Anderson, the State of Minnesota enacted the Child Victims Act (Minn. Stat. § 541.073). This Act eliminated, for three years, the statute of limitations on any claims for damages based on sexual abuse of a minor, except for claims based on vicarious liability or respondeat superior. This three-year period is called the "Reviver Period."

2.      The Archdiocese of St. Paul and Minneapolis ("Archdiocese"), as the largest Catholic body in the state, is named as a defendant in many claims brought under the Child Victims Act. To date, more than 20 individuals have filed suit against the Archdiocese, and dozens more have filed formal Notices of Claim under Minnesota Statute § 549.09.

3.      In these suits and claims (collectively the "Clergy Abuse Claims"), individuals recount tales of childhood sexual abuse by priests and lay employees of the Archdiocese.

4.      Some of these Clergy Abuse Claims seek damages for alleged abuse as far back as the 1940s. At the time, the plaintiffs were children, and the alleged perpetrators were adults. The supervisors of the alleged perpetrators were typically more senior members of the Archdiocesan clergy. Due to the passage of time, many of the oldest claims seek damages for conduct by long-dead supervisors of the alleged perpetrators.

5.    The Clergy Abuse Claims assert negligence-based claims, such as negligence, negligent supervision, and negligent retention. Several Clergy Abuse Claims also allege nuisance claims based on the Archdiocese's alleged failure to warn the public about molesters in their midst. The nuisance claims assert both intentional and negligent conduct.

6.    With seventeen months remaining before the Reviver Period closes, additional claims are a near-certainty.

7.    The Archdiocese asserts that insurance policies allegedly issued by the insurer defendants and third-party defendants provide coverage for the damages caused by the childhood sexual abuse alleged in the Clergy Abuse Claims. The Archdiocese also asserts that the primary insurers are obliged to provide a defense for the Clergy Abuse Claims.

8.    This is an action for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 seeking a judicial determination of rights of the parties under policies issued to the Archdiocese. As described below, an actual and justiciable controversy exists regarding the extent of CNA Insurers' obligations to the Archdiocese with respect to the Clergy Abuse Claims. Because rulings as to coverage potentially have implications that would affect the Archdiocese's coverage and in order to obtain comprehensive declarations and minimize the possibility of inconsistent rulings on similar policy terms or underlying facts, CNA Insurers have brought cross-claims against the other insurer defendants and a third-party complaint against the Catholic Mutual Relief Society and

State Farm Fire & Casualty Company, which are alleged insurers of the Archdiocese not named in the Archdiocese's Complaint.

## PARTIES

### Cross-Claimants, Counterclaimants, and Third-Party Plaintiffs

9.      Cross-Claimant, Counterclaimant, and Third-Party Plaintiff CIC, as successor by merger to F&C, is a Pennsylvania corporation with its principal place of business in Chicago, Illinois.  CIC conducts its insurance business throughout the United States and is authorized to, and does, transact business in the State of Minnesota.

10.      Cross-Claimant, Counterclaimant, and Third-Party Plaintiff NFIC is an Illinois company with its principal place of business in Chicago, Illinois.  NFIC conducts its insurance business throughout the United States and is authorized to, and does, transact business in the State of Minnesota.

11.      Cross-Claimant, Counterclaimant, and Third-Party Plaintiff Continental Casualty is an Illinois corporation with its principal place of business in Chicago, Illinois.  Continental Casualty conducts its insurance business throughout the United States and is authorized to, and does, transact business in the State of Minnesota.

### Counter-Defendant Archdiocese

12.      On information and belief, the Archdiocese is a Minnesota not-for-profit corporation with a principal place of business in Minnesota.  The Archdiocese is authorized to, and does, transact business in the state of Minnesota.

13.    On information and belief, the Archbishop is the top official of the

Archdiocese and is given authority over all matters within the Archdiocese as a result of

his position and has authority over all Roman Catholic clerics within the Archdiocese.

The Archdiocese functions as a business by engaging in numerous revenue-producing

activities and soliciting money from its members in exchange for its services.  The

Archdiocese has long sponsored programs that seek out the participation of children in

its activities.  The Archdiocese, through its officials, has control over those activities

involving children.  The Archdiocese has the power to appoint, supervise, monitor, and

terminate employment of each person working with children within the Archdiocese.

### Cross-Defendant Insurers

14.    The Archdiocese asserts that it purchased applicable insurance from the

insurers identified below in paragraphs 15 to 24 and 33.  The Archdiocese seeks sums

from the CNA Insurers and the insurers identified in Paragraphs 15 to 24 arising from

the Clergy Abuse Claims.

15.    On information and belief, Cross-Defendant Aetna Casualty and Surety

Company n/k/a Travelers Casualty and Surety Company, and its Affiliates is a

Connecticut corporation with its primary place of business in Hartford, Connecticut.  It

is authorized to, and does, transact business in the State of Minnesota.  On information

and belief, the Archdiocese seeks coverage under various primary and umbrella policies

allegedly issued by Aetna to the Archdiocese.

16.     On information and belief, Cross-Defendant American Home Assurance

Company is a New York corporation with its primary place of business in New York,

New York.  It is authorized to, and does, transact business in the State of Minnesota.

On information and belief, the Archdiocese seeks coverage under umbrella policies

allegedly issued by American Home to the Archdiocese.

17.     On information and belief, Cross-Defendant Fireman's Fund Insurance

Company successor to Fireman's Fund Indemnity Company is a California corporation

with its primary place of business in Novato, California.  It is authorized to, and does,

transact business in the State of Minnesota.  On information and belief, the Archdiocese

seeks coverage under primary polices allegedly issued by FFIC to the Archdiocese.

18.     On information and belief, Cross-Defendant Hartford Accident and

Indemnity Company is a Connecticut corporation with its primary place of business in

Hartford, Connecticut.  It is authorized to, and does, transact business in the State of

Minnesota.  On information and belief, the Archdiocese seeks coverage under primary

insurance policies allegedly issued by Hartford to the Archdiocese.

19.     On information and belief, Cross-Defendant TIG Insurance Company

successor to International Insurance Company is a California company with its primary

place of business in Manchester, New Hampshire.  It is authorized to, and does, transact

business in the State of Minnesota.  On information and belief, the Archdiocese seeks

coverage under primary insurance policies allegedly issued by International to the

Archdiocese.

20.    On information and belief, Cross-Defendant Interstate Fire & Casualty Company is an Illinois corporation with its primary place of business in Chicago, Illinois. It is authorized to, and does, transact business in the State of Minnesota. On information and belief, the Archdiocese seeks coverage under various umbrella insurance policies allegedly issued by Interstate to the Archdiocese.

21.    On information and belief, Cross-Defendants the "London Market Insurers" are the Syndicates, Names, and Managing Agents of Bellefonte Insurance Company, Excess Insurance Company a/k/a Excess Insurance Company Limited, Terra Nova Insurance Company, Dominion Insurance Company, Soverign Marine & General Insurance Company Limited a/k/a Sovereign Marine & General Insurance Company Limited, Stronghold Insurance Company Limited, Yasuda Fire & Marine Insurance Company (U.K.) Limited, Sphere Drake Insurance PLC, and CNA Reinsurance of London, limited, which are all insurers who are citizens of, and have a principal place of business in, the United Kingdom or other jurisdictions outside the United States. The London Market Insurers are authorized to, and do, transact business in the State of Minnesota. On information and belief, the Archdiocese seeks coverage under indemnity policies allegedly issued by the London Market Insurers to the Archdiocese.

22.    On information and belief, Cross-Defendant 21st Century Centennial Insurance Company f/k/a Colonial Penn Insurance Company is a Pennsylvania company with its principal place of business in Wilmington, Delaware. It is authorized to, and does, transact business in the State of Minnesota. On information and belief, the

Archdiocese seeks excess coverage under policies allegedly issued by Colonial Penn to the Archdiocese.

### Third-Party Defendant Insurers

23.    On information and belief, Third-Party Defendant Catholic Mutual Relief Society  is a Nebraska corporation with its primary place of business in Omaha, Nebraska.  It is authorized to, and does, transact business in the State of Minnesota.  On information and belief, the Archdiocese seeks coverage under primary polices allegedly issued by Catholic Mutual to the Archdiocese.

24.    On information and belief, Third-Party Defendant State Farm Fire & Casualty Company is an Illinois corporation with its primary place of business in Bloomington, Illinois.  It is authorized to, and does, transact business in the State of Minnesota. On information and belief, the Archdiocese seeks coverage under primary policies allegedly issued by State Farm to the Archdiocese.

### JURISDICTION AND VENUE

25.    This is an action for declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

26.    The Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because the insurer parties are citizens of different states or foreign jurisdictions from the Archdiocese, and the amount in controversy is in excess of $75,000 exclusive of interest and costs.

27.     In addition, the Court has supplemental jurisdiction under 28 U.S.C.

§ 1367 as to all parties because the claims against each Cross-Defendant or Third-Party

Defendant are so related to the claims in this action that they form part of the same case

or controversy.

28.     This Court has personal jurisdiction over each party because each party

has sufficient contacts with the State of Minnesota and has otherwise availed itself of

the markets of Minnesota.

29.     Venue is proper in this District under 28 U.S.C. § 1391(a)(2) because a

substantial part of the events or omissions giving rise to the dispute occurred in this

District.

**PLAINTIFFS' ALLEGED POLICIES**

30.     The Archdiocese alleges that F&C issued two primary comprehensive

general liability policies (the "Alleged CIC Primary Policies"):  XP 74084 (unknown

inception date- 8/1/52) (the "Alleged CIC Pre-'52 Primary Policy") and XP 128258

(8/1/52-8/1/55) (the "Alleged CIC '52-'55 Primary Policy").  Despite diligent searching,

CNA Insurers have been unable to locate any copy or secondary evidence of the

Alleged CIC Primary Policies.  The Archdiocese reports that it has not located a copy of

either of these Alleged CIC Primary Policies.  The Archdiocese has provided a

declarations page, attached as Exhibit A, which purports to be a declarations page for

the Alleged CIC '52-'55 Primary Policy.  The Archdiocese also relies on this document

as secondary evidence for the Alleged CIC Pre-'52 Primary Policy.

31.     The Archdiocese alleges that National Fire issued Homeowners Policy No. HO 452 75 87 (8/16/63 – 8/16/66) (the "NFIC Homeowner's Policy").  The Archdiocese has provided the documents attached as Exhibit B, which purport to be a copy of the NFIC Homeowner's Policy.

32.     The Archdiocese alleges that Continental Casualty issued an umbrella excess policy, No. RDU 9799786 (8/17/66-8/17/69) (the "Continental Casualty Umbrella Policy").  Despite diligent searching, CNA Insurers have unable to locate any copy or secondary evidence of the Alleged Continental Casualty Umbrella Policy.  The Archdiocese has not located a copy of the Alleged Continental Casualty Umbrella Policy.  The Archdiocese has provided a declarations page, attached as Exhibit C, which purports to be a declarations page for the Alleged Continental Casualty Umbrella Policy.

## INSOLVENT INSURER'S ALLEGED POLICIES

33.     The Archdiocese alleges that Home Indemnity Company ("Home") issued two primary policies:  Policy No. CGL54010 (August 1, 1961 – August 1, 1964); Policy No. CGL63810 (August 1, 1964 – August 1, 1967) (the "1964 Home Primary Policy"). The Archdiocese has provided the documents attached as Exhibit D, which purport to be a copy of the 1961 – 1964 Home Policy.  Home is in liquidation and not affiliated with any party to this litigation.

## FIRST CAUSE OF ACTION
### (No Coverage Under Alleged CIC Pre-'52 Primary Policy)

34.    CNA Insurers repeat and incorporate each of the preceding paragraphs as though fully set forth herein.

35.    The Archdiocese contends the Alleged CIC Pre-'52 Primary Policy provides coverage for the Clergy Abuse Claims.

36.    Despite a diligent search, CNA Insurers have located no copy of the Alleged CIC Pre-'52 Primary Policy nor any secondary evidence of coverage, which would be more than 62 years old.

37.    The Archdiocese has the burden of proving the essential terms and conditions of the Alleged CIC Pre-'52 Primary Policy and that the Alleged CIC Pre-'52 Primary Policy provides coverage for the Clergy Abuse Claims.

38.    The Archdiocese has not located a copy of the Alleged CIC Pre-'52 Primary Policy.  The Archdiocese's sole secondary evidence of this alleged policy is the inclusion of the number XP74084 next to the words "Preceding Policy" on the declarations page for the Alleged CIC '52-'55 Primary Policy.

39.    Neither the Archdiocese nor Continental has located any secondary evidence of the material terms of the Alleged CIC Pre-'52 Primary Policy such as, for example, policy term, policy limits, hazards insured, nature of coverage, geographic scope of coverage, existence (or lack thereof) of a defense obligation, or underlying limits/retention.

40.     Without this evidence, the Archdiocese is unable to prove the essential terms and conditions of the Alleged CIC Pre-'52 Primary Policy.  It is also unable to prove that the Alleged CIC Pre-'52 Primary Policy provides coverage for the Clergy Abuse Claims or that the Archdiocese has satisfied all conditions of coverage.

41.     Accordingly, CIC is entitled to a declaration that it has no obligation under the Alleged CIC Pre-'52 Primary Policy to defend or indemnify the Archdiocese in the Clergy Abuse Claims.

## SECOND CAUSE OF ACTION
## (No Coverage Under NFIC Homeowner Policy)

42.     CNA Insurers repeat and incorporate each of the preceding paragraphs as though fully set forth herein.

43.     The Archdiocese asserts that the NFIC Homeowner's Policy provides coverage for the Clergy Abuse Claims.

44.     Although issued to the Diocese of St. Paul and Leo Binz, D.D. and Rev. William Hunt, the NFIC Homeowner's Policy is not a business policy.  Instead, the purpose of this policy was to provide personal insurance to the named insureds.

45.     The Archdiocese recognized that the NFIC Homeowner's Policy was not a significant source of business liability coverage by purchasing comprehensive general liability insurance from Home for the very years covered by the NFIC Homeowner's Policy, as alleged above in Paragraph 33.  Further, the NFIC Homeowner's Policy does

not appear in the ledger of the Archdiocese's liability insurance as maintained by the

Archdiocese's broker.

46.    The NFIC Homeowner's Policy contains a "Business Pursuits" exclusion,

which states that coverage does not apply "to any business pursuit of an Insured, except

Coverages E and F, activities therein which are ordinarily incident to non-business

pursuits." (Ex. B, p. 11 Special Exclusions (a).)

47.    The Clergy Abuse Claims allege that the Archdiocese, in its capacity as

employer, failed to properly supervise and retain the perpetrators of abuse. They

further allege that the Archdiocese, in its capacity as a provider of social services, failed

to notify the community of known molesters under its employ.

48.    The activities described in the Clergy Abuse Claims all arose in the context

of the Archdiocese's business pursuits as a religious organization, a provider of social

services, and an employer. Further, none of these activities are ordinarily incident to

non-business activities. As a result, these allegations fall squarely within the Business

Pursuits exclusion, and the NFIC Homeowner's Policy provides no coverage for

defense or indemnity for the Clergy Abuse Claims.

49.    Accordingly, NFIC is entitled to a declaration that it has no obligation

under the NFIC Homeowner's Policy to defend or indemnify the Archdiocese in the

Clergy Abuse Claims.

## THIRD CAUSE OF ACTION
### (No Umbrella Drop-Down For Period Excess Of Insolvent Primary)

50.    CNA Insurers repeat and incorporate each of the preceding paragraphs as though fully set forth herein.

51.    The Continental Casualty Umbrella Policy declaration page provides that the policy's Limit of Liability for personal injury claims are excess of "the amount recoverable under the underlying insurance as set out in the attached schedule." (Ex. C.)

52.    The Archdiocese has been unable to locate the schedule referenced in the declaration page but nevertheless alleges, based on purported secondary evidence, that Continental Casualty Umbrella Policy is excess to the 1964 Home Primary Policy.

53.    As set forth in the declaration page, Continental Casualty's obligation, if any, to cover the Clergy Abuse Claims arises only after the limits of the liability of Home have been satisfied.  With Home insolvent, the Archdiocese must satisfy that condition with its own funds.

54.    Accordingly, Continental Casualty is entitled to a declaration that it has no obligation to provide indemnity to the Archdiocese for Clergy Abuse Claims unless the Archdiocese establishes that it has satisfied the limits of the 1964 Home Primary Policy.

## FOURTH CAUSE OF ACTION
### (Trigger)

55.     CNA Insurers repeat and incorporate each of the preceding paragraphs as

though fully set forth herein.

56.     The alleged policies issued by CIC[2], NFIC, and Continental Casualty

require that the claim arise from damages for which the Archdiocese is liable arising

from an "accident" or "occurrence" during the policy period.

57.     Under Minnesota law, a plaintiff asserting a negligence-based cause of

action must establish that the plaintiff's injury was reasonably foreseeable to the

defendant.  In the context of the Clergy Abuse Claims, there can be no negligence-based

liability for abuse that occurred before the Archdiocese had the requisite notice; before

that date, plaintiffs' injuries were not reasonably foreseeable to the Archdiocese.

58.     To trigger coverage for sexual abuse causing bodily injury under an

accident- or occurrence-based policy, Minnesota law also requires that the abuse occur

during the policy period.

59.     As a result, CNA Insurers are entitled to a declaration that they have no

obligation to provide coverage for negligence-based claims that do not allege post-

notice abuse during the policy period.

_____

[2] All terms regarding the Alleged CIC Pre-'52 Primary Policy are unknown.  The
allegations in this Count apply to the Alleged CIC Pre-'52 Primary Policy in the
alternative, only if the Archdiocese is able to prove the existence and material terms of
the Alleged CIC Pre-'52 Primary Policy, and those policy terms are similar to those
alleged in this Count.

## FIFTH CAUSE OF ACTION
### (Pro Rata Allocation For Indemnity)

60.     CNA Insurers repeat and incorporate each of the preceding paragraphs as though fully set forth herein.

61.     Under Minnesota law, where insurers are held consecutively liable for a single occurrence, and there is no evidence allocating the timing of actual damages, the proper method of allocating damages is *pro rata* time on the risk.

62.     Under this method of allocation, each triggered policy bears a share of total damages proportionate to the time period coverage was triggered, and the Archdiocese must bear its share of any liability for periods in which it had no insurance coverage.

63.     CNA Insurers are thus entitled to a declaration that it has no obligation to provide indemnity for any portion of the Clergy Abuse Claims in excess of that calculated using a *pro rata* time on the risk approach.

## SIXTH CAUSE OF ACTION
### (Scope of the Accidents/Occurrences)

64.     CNA Insurers repeat and incorporate each of the preceding paragraphs as though fully set forth herein.

65.     The alleged policies issued by CIC[3], NFIC, and Continental Casualty contain per-accident or per-occurrence limits of liability.

---

[3] *See* footnote 2.

66.     The Archdiocese seeks coverage for the negligence-based causes of action in the Clergy Abuse Claims on the theory that the allegedly negligent supervision or retention of a perpetrator was an accident or occurrence giving rise to coverage.

67.     On information and belief, the Archdiocese's decisions regarding supervision or retention of priests were made on an Archdiocese-wide or priest-by-priest basis.  The Archdiocese did not make supervision or retention decisions about priests on a parishioner-by-parishioner basis.  On information and belief, the Archdiocese's decisions regarding the supervision or retention of employees were also made at the Archdiocese-wide or employee level and not at the parishioner level.

68.     As a result, CNA Insurers are entitled to a declaration that the negligent supervision or retention of all perpetrators or, at most, each perpetrator constitutes a single occurrence, without regard to the number of children allegedly abused by that perpetrator.

### SEVENTH CAUSE OF ACTION
### (Treatment of Multi-Year Policies)

69.     CNA Insurers repeat and incorporate each of the preceding paragraphs as though fully set forth herein.

70.     The Alleged Policies (other than the Alleged CIC Pre-'52 Primary Policy, for which all policy information is unknown) are three-year policies.

71.     Absent specific language stating otherwise, accident or occurrence limits in multi-year policies are intended to apply as a single limit for the entire policy period.

72.    On information and belief, the Archdiocese asserts that the accident or occurrence limits in these policies are annual limits.  In other words, the Archdiocese asserts that for limits purposes, the three-year policies are treated as three one-year policies.

73.    The Archdiocese bears the burden of proving the terms of coverage, including all terms relating to application of limits.

74.    The Alleged Polices[4] do not provide that the accident or occurrence limits are annual limits rather than policy-term limits.

75.    Therefore, CNA Insurers are entitled to a declaration that the accident or occurrence limits in the Alleged Policies are calculated on a policy-period basis, not an annual basis.

## EIGHTH CAUSE OF ACTION
### (No Accident)

76.    CNA Insurers repeat and incorporate each of the preceding paragraphs as though fully set forth herein.

77.    The alleged policies issued by CIC[5], NFIC, and Continental Casualty apply only to accidental events.

78.    Minnesota law defines "accident" as an "unexpected, unforeseen, or undesigned happening from either a known or unknown cause."

---

[4] *See* footnote 2.
[5] *See* footnote 2.

79.     Certain of the Clergy Abuse Claims assert intentional torts, such as intentional concealment giving rise to a public or statutory nuisance.  Other Clergy Abuse Claims allege that damages result from abuse or actions that were expected or foreseen by the Archdiocese and thus were not "accidents" under Minnesota law.

80.     Because such conduct falls outside the grant of coverage, CNA Insurers are entitled to a declaration that they have no obligation to provide coverage for Clergy Abuse Claims that arose from events that were expected or foreseen.

### NINTH CAUSE OF ACTION
### (Expected Or Intended)

81.     CNA Insurers repeat and incorporate each of the preceding paragraphs as though fully set forth herein.

82.     The alleged policies issued by CIC[6], NFIC, and Continental Casualty do not provide coverage for bodily injuries that were expected and/or intended by the Archdiocese.

83.     Certain of the Clergy Abuse Claims assert intentional torts, such as intentional concealment giving rise to a public or statutory nuisance.  Other Clergy Abuse Claims allege that the damages were expected or foreseen by the Archdiocese.

84.     Because such damages are excluded, CNA Insurers are entitled to a declaration that it has no obligation to provide coverage for Clergy Abuse Claims to the extent that the alleged damages were expected or intended by the Archdiocese.

_____

[6] *See* footnote 2.

## TENTH CAUSE OF ACTION
## (Breach of Contract - Late Notice)

85.     CNA Insurers repeat and incorporate each of the preceding paragraphs as though fully set forth herein.

86.     The alleged policies issued by CIC[7], NFIC, and Continental Casualty require the Archdiocese to provide timely notice of accidents or occurrences that take place during the policy period.  This obligation survives beyond the end of the policy period.

87.     The Clergy Abuse Claims allege that the Archdiocese has long been aware of abuse by its priests or employees.  Nevertheless, the Archdiocese did not provide CNA Insurers with notice of any accidents or occurrences until 2014, thus breaching their contractual obligations.

88.     The Archdiocese's failure to provide timely and effective notice of the Clergy Abuse Claims has prejudiced CIC, NFIC, and Continental Casualty.  They have lost the opportunity to fully assess the nature, severity, and risks of the conduct alleged in the Clergy Abuse Claims.  They are unable to obtain information from key witnesses with relevant knowledge who have died, disappeared, or become incapacitated, and documents have been lost or destroyed.

89.     As a result of such breach by the Archdiocese of the alleged insurance policies, CNA Insurers are entitled to a declaration that the Archdiocese is not entitled

---

[7] *See* footnote 2.

to coverage to the extent the Archdiocese failed to provide prompt notice of an accident

or occurrence.

WHEREFORE, CNA Insurers pray for judgment as follows:

a)     On the First Cause of Action:  for an order declaring that CIC has no

obligation under the alleged Policy No. XP 74084 to defend or indemnify

the Archdiocese in the Clergy Abuse Claims;

b)     On the Second Cause of Action:  for an order declaring that NFIC has no

obligation under the NFIC Homeowner's Policy to defend or indemnify

the Archdiocese in the Clergy Abuse Claims;

c)     On the Third Cause of Action:  for an order declaring that Continental

Casualty has no obligation to provide indemnity to the Archdiocese for

Clergy Abuse Claims unless the limits of the 1964 Home Primary Policy

have been satisfied by payment by the Archdiocese;

d)     On the Fourth Cause of Action:  for an order declaring that CNA Insurers

have no obligation to provide coverage for negligence-based claims that

do not allege post-notice abuse during the policy period;

e)     On the Fifth Cause of Action:  for an order declaring that CNA Insurers

have no obligation to provide indemnity for any portion of the Clergy

Abuse Claims above that calculated using a *pro rata* time on the risk

approach.

f)      On the Sixth Cause of Action:  that the negligent supervision or retention

of all perpetrators or, at most, each perpetrator constitutes a single

occurrence, without regard to the number of children allegedly abused by

that perpetrator.;

g)      On the Seventh Cause of Action:  for an order declaring that the accident

or occurrence limits in the Alleged Policies are calculated on a policy-

period basis and not an annual basis;

h)      On the Eighth Cause of Action:  for an order declaring that CNA Insurers

have no obligation to provide coverage for any Clergy Abuse Claims to

the extent that they arose from events that were not unexpected or

unforeseen;

i)      On the Ninth Cause of Action:  for an order declaring that CNA Insurers

have no obligation to provide coverage for Clergy Abuse Claims to the

extent that the alleged damages were expected or intended by the

Archdiocese;

j)      On the Tenth Cause of Action:  for an order declaring that that the

Archdiocese is not entitled to coverage to the extent the Archdiocese failed

to provide prompt notice of an accident or occurrence;

k)      Awarding CNA Insurers' attorneys' fees and costs, as appropriate; and

l)      Granting such further relief as the Court deems just and proper.

Dated:  December 30, 2014               s/Jeanne H. Unger
                                        Jeanne H. Unger (#0131404)
                                        **Bassford Remele, P.A.**
                                        33 South Sixth Street, Suite 3800
                                        Minneapolis, MN  55402-3707
                                        Telephone:  (612) 333-3000
                                        Facsimile:  (612) 333-8829
                                        Email:  junger@bassford.com

                                        AND

                                        Laura K. McNally (Motion for *Pro Hac Vice*
                                        Admission to follow)
                                        **Grippo & Elden LLC**
                                        111 S. Wacker Drive
                                        Chicago, IL  60606
                                        Telephone:  (312) 704-7700
                                        Facsimile:  (312) 558-1195
                                        Email:  lmcnally@grippoelden.com

                                        **ATTORNEYS FOR DEFENDANT AND
                                        THIRD-PARTY PLAINTIFF THE
                                        CONTINENTAL INSURANCE COMPANY,
                                        successor by merger to THE FIDELITY AND
                                        CASUALTY COMPANY OF NEW YORK,
                                        NATIONAL FIRE INSURANCE
                                        COMPANY, and CONTINENTAL
                                        CASUALTY COMPANY**